E-FILED
Tuesday, 04 February, 2020 11:45:00 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORI PIPER on behalf of<br>JAMES R. PIPER, deceased,<br><br>       Plaintiff,<br><br>    v.<br><br>ANDREW SAUL, Commissioner<br>of Social Security,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 18-cv-3249 |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lori Piper, on behalf of her deceased husband James R. Piper (Piper), appeals from the denial of Piper's application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Lori Piper filed a Motion for Summary Judgment (d/e 13). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18). This matter is before this Court for a Report and Recommendation. For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be reversed and remanded for further proceedings.

## STATEMENT OF FACTS

Piper was born on December 9, 1967.  He completed high school. He previously worked as a structural steel worker.  Piper did not engage in substantial gainful activity after October 19, 2011 (Onset Date).  Piper met insured status for Disability Benefits through December 31, 2015 (Last Date Insured).  As of the Last Date Insured, Piper suffered from cervical and lumbar degenerative disc disease, headaches, history of traumatic injury to his left shoulder and arm, and depression.  Certified Copy of Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), at 21-22, 27, 41, 44.

On September 9, 2011, Piper saw Dr. Virginia Hernandez at Southern Illinois University (SIU) Family Medicine Clinic.  Piper saw Dr. Hernandez for a follow up of treatment of Piper's injury at work.  R. 365-68. On August 10, 2011, Piper injured his left shoulder, arm, and wrist in an accident at work.  R. 42.  Piper reported that he had 12 physical therapy sessions and his condition was not improved.  Piper reported that aspirin, ibuprofen, and prescription creams did not help his pain.  He rated his pain at 6/10 and said that a cortisone shot helped for two days.  His hand swelled and he experienced pain in his elbow daily.  R. 365.  On examination, Piper was 67 inches tall and weighed 151 pounds; he had

tenderness to palpation in his left shoulder and elbow, swelling in his left AC joint and elbow, and limited range of motion with his left upper extremity.  R. 365-68.  Dr. Hernandez ordered x-rays.  X-rays of the left wrist, elbow, and shoulder were negative, but x-rays of the cervical spine showed degenerative narrowing of C5-C6 and C6-C7.  R. 360-64.

On October 18, 2011, Piper saw Dr. Hernandez for a follow up.  R. 355-58.  Dr. Hernandez stated that Piper was scheduled to see orthopedic surgeon Dr. Saadiq El-Amin, M.D., Ph.D., for shoulder surgery.  An MRI showed that Piper had a superior labral tear in his shoulder.  Piper was working light duty.  Piper rated his pain at 9/10.  R. 355.  On examination, Piper's left shoulder and elbow were tender, swollen, and had limited range of motion. R. 358.

On November 23, 2011, Dr. El-Amin performed surgery on Piper's left shoulder to repair the labral tear.  R. 342.

On December 12, 2011, Piper saw Dr. Hernandez for a follow up after the surgery.  Piper reported that he was doing well.  Piper was having trouble getting into a comfortable position to sleep.  Piper was scheduled to start physical therapy in four weeks.  R. 342.

On May 7, 2012, Piper saw Dr. Vishal Saini, M.D.  Piper reported that his pain decreased after the surgery.  He reported that physical therapy

aggravated his pain.  Piper rated his pain at 6/10.  On examination, Piper's

left shoulder was abnormal on palpation and his range of motion was

impaired.  R. 333, 335.  Piper's left elbow was tender over the epicondyles.

R. 335.

On June 13, 2012, Dr. El-Amin performed an epicondylectomy with

extensor tendon repair on Piper's left elbow.  R. 328.

On March 6, 2013, Dr. El-Amin performed a repeat repair surgery on

Piper's left shoulder.  R. 319, 322.

On November 21, 2013, Piper saw Dr. Edward Trudeau, M.D., for an

EMG/nerve conduction study.  Dr. Trudeau found left C6 radiculopathy,

moderately severe.  Dr. Trudeau found no evidence of entrapment

neuropathy or neuropathy in the left elbow or wrist.  R. 304.

On December 18, 2013, Piper saw Dr. Imad Aziz, M.D.  Piper

reported headaches for the prior three months.  Piper said Motrin, Tylenol,

and cyclobenzaprine did not relieve the pain.  Dr. Aziz noted that the

November 2013 EMG study showed C6 radiculopathy.  Piper also reported

feeling depressed since the 2011 surgery.  R. 318-19.  Dr. Aziz prescribed

amitriptyline and Celexa.  R. 318.

On February 6, 2014, Piper saw Dr. Rakerry Rahman, M.D. for neck

pain.  Piper rated his pain at 5/10 at the time of the visit and said his pain

went up to 8/10 at the worst. Piper said walking and turning his head aggravated the pain, and nothing relieved the pain. He also had numbness in his hands. On examination, Piper had normal gait, negative Romberg and Hoffman tests, good range of motion, 5/5 strength throughout except 4/5 strength in the left wrist and a weak grip in the left hand and decreased sensation in the ulnar digits.[1] Spurling maneuver caused left shoulder pain.[2] Dr. Rahman provisionally diagnosed cervical radiculopathy. Dr. Rahman order a CT myelogram. R. 527-28.

On April 24, 2014, Piper saw Dr. El-Amin for pain in his left shoulder. Piper also complained of numbness and tingling in his neck. An MRI showed another tear in his left rotator cuff. Dr. El-Amin scheduled Piper for surgery for rotator cuff repair. R. 555.

On June 12, 2014, Piper saw Dr. Rahman. Piper reported shoulder pain and neck stiffness. The pain was located in the neck and nothing had relieved the pain. He also reported numbness and tingling in the right arm. On examination, Piper had normal sensation, tone, reflexes, and range of motion, except for his left shoulder. Piper's left shoulder was mildly tender

---

[1] Hoffman test is a test of reflexes in the fingers. See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1712. Romberg's sign is a test of balance with feet close together and eye closed. See Dorland's, at 1715.

[2] Spurling's maneuver is a test for radiculopathy in which the physician presses down on the head while the patient rotates the head laterally. See Dorland's, at 1900.

to palpation with 4/5 strength and pain with passive range of motion.  Piper also had a positive Spurling's test that caused right shoulder pain.  Dr. Rahman stated that a CT myelogram on June 11, 2014 showed C4-C5 and C5-C6 disc herniations and an irregular disc space at C6-C7 consistent with pseudarthrosis.  R. 520-21.

On July 7, 2014, Dr. Rahman performed surgery on Piper's neck to fuse his vertebrae at C4-C6.  R. R. 518-19.

On September 3, 2014, Dr. El-Amin performed surgery to repair a tear in Piper's left biceps tendon, to repair another tear in his left rotator cuff, and to perform a left subacromial decompression and acromioplasty. The surgery had no complications.  R. 540-41.

On November 20, 2014, Piper saw Dr. Rahman's physician's assistant Galina Polevaya, PA-C, for a post-surgery follow up.  Polevaya assessed that Piper's condition had improved.  Polevaya stated,

> Patient continues to complain of no pain located in the neck with nothing alleviating and nothing Aggravating.  Patients states
>
> The severity is rated as moderate
> Associated signs and symptoms include stiffness in the neck with [range of motion].

R. 591.  On examination, Piper had 5/5 strength and normal sensation,
tone reflexes, and range of motion without tenderness or guarding.  X-rays
showed stable post-operative changes.  R. 592.

On February 26, 2015, Piper saw Dr. Rahman for a post-surgery
follow up.  Dr. Rahman said that Piper was "recovering remarkably."  Piper
only complained of occasional headaches.  R. 589. On examination, Piper
was oriented with normal mood and affect.  He had normal strength,
sensation, tone, reflexes, and coordination in his bilateral upper extremities.
Piper complained of a stiff neck.  X-rays showed no fractures or evidence
of problems with the fusion.  R. 590.

On March 5, 2015, state agency physician Dr. Lenore Gonzalez,
M.D., prepared a Physical Residual Functional Capacity Assessment.  R.
68-71.  Dr. Gonzalez opined that Piper could lift 10 pounds occasionally
and frequently, stand and/or walk for six hours in an eight-hour workday, sit
for six hours in an eight-hour workday, and occasionally push and/or pull
with his upper extremities.  Dr. Gonzalez opined that Piper could
occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or
ramps, and never climb ropes, ladders, or scaffolds.  Dr. Gonzalez opined
that Piper was limited to occasional reaching overhead, in front, and/or
laterally with both hands; and occasional handling, fingering, and feeling

with his left hand.  R. 69-70.  Dr. Gonzalez stated, "Claimant has
Hypethesis (sic) diffusely in [left upper extremity] and cervical radiculopathy
which would limit all levels above [reaching, handling, fingering, and
feeling] to occasionally." R. 70.  Dr. Gonzalez opined that Piper should
avoid even moderate exposure to extreme cold, extreme heat, and
hazards.  R. 70.

On March 18, 2015, Piper saw state agency physician Dr. Vittal
Chapa, M.D., for a consultative examination.  R. 603-09.  Piper reported
that he had a remote history of neck surgery in 2008.  He told Dr. Chapa
that after his injury in 2011, he had five surgeries to his left elbow, left
shoulder, and neck.  He reported a throbbing ache in his neck and that he
had daily headaches.  He said that his neck gets stiff if he sits for long.  He
said that he could not walk far and could not lie down on his left side.  He
had pain in his shoulder and neck.

On examination, Dr. Chapa observed that Piper had a normal gait; he
was oriented and was in good contact with reality, and his reflexes were
symmetric with triceps reflexes absent bilaterally. Piper had paravertebral
muscle spasms in his neck.  Piper's grip right strength was 5/5 but his left
grip strength was 3/5.  Piper could perform both fine and gross
manipulations with both hands, but his left hand functions were limited due

to limited range of motion in the left shoulder and pain.  Piper had 3/5 strength in his left upper extremity.  Straight leg testing was negative.  Piper had full range of motion in all joints except the left shoulder and cervical spine.  Piper had no muscle atrophy in his hand but had muscle atrophy in the left deltoid muscle.  Dr. Chapa listed his diagnostic impression as chronic cervical pain syndrome.  R. 604-05.

On the same day, March 18, 2015, Piper saw state agency psychologist Dr. Michael Trieger, Psy.D., for a psychological evaluation.  R. 597-600.  On examination, Piper said he had trouble sleeping because of the pain and stiffness.  Piper was downcast and tearful in mood and affect.  He was oriented and his speech normal, and his thought processes were organized, relevant, and coherent.  R. 598.  Piper's reasoning skills were adequate.  His recent and remote memory were intact.  His judgment was adequate and he had "decent powers of concentration" during the evaluation.  Dr. Trieger assessed major depressive disorder, recurrent, moderate to severe, and gave Piper a Global Assessment of Functioning (GAF) score of 44.  The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.)

(DSM IV-TR), at 32-35.  A GAF score of 41 to 50 indicated either serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.  Beginning in 2013, the American Psychiatric Association no longer recommended use of the GAF score. Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On April 1, 2015, state agency physician Dr. David Mack, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 83-86. Dr. Mack opined that Piper could occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally push and/or pull with his upper extremities.  Dr. Mack opined that Piper could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and could never climb ropes, ladders, or scaffolds.  Dr. Mack opined that Piper was limited to occasional reaching overhead, in front, and/or laterally with both hands; and occasional handling, fingering, and feeling with his left hand.  Dr. Mack gave the same reason as Dr. Gonzalez for these limitations.  Dr. Mack opined that Piper should avoid even moderate exposure to extreme cold, extreme heat, and hazards.  R. 83-95.

On May 4, 2015, Piper saw pain specialist Fernand Salvacion, M.D. for a pain consult.  Piper reported that hydrocodone and oxycodone did not

help with his pain in the past.  On examination, Piper had limited range of motion in his cervical spine "secondary to pain."  He also had limited range of motion in his left shoulder.  Piper had palpable muscle spasming in the paraspinal and trapezius muscles.  Piper's motor and sensation were intact in his upper extremities.  Dr. Salvacion referred Piper to a psychologist for an evaluation for long-term medical management.  Piper completed an evaluation form that indicated Piper was at risk for substance abuse.  R. 860.

On June 30, 2015, Piper saw Dr. Salvacion.  The psychological examination did not identify significant contraindications for medical management with opioid therapy.  On examination, Piper had palpable spasms in his cervical paraspinal muscles and into the left shoulder.  Dr. Salvacion prescribed a Butrans patch, an opioid analgesic.  R. 843.

On July 21, 2015, Piper saw Dr. Salvacion.  Piper reported that he could not tell much difference with the Butrans patch.  On examination, Piper had spasming on palpation of the cervical paraspinal muscles and trapezius muscles.  Dr. Salvacion changed the Butrans patch prescription to a higher dose.  R. 836.

On September 24, 2015, Piper saw Dr. Salvacion's nurse practitioner Alison Seiz, N.P.  On examination, Piper had spasming and tenderness on

palpation of the cervical paraspinal muscles and trapezius muscles. He denied any change in sensation. He had decreased range of motion in his neck. He walked with a stiff, guarded appearance. His left upper extremity strength was 4/5 and his right was 5/5. Seiz recommended a return to physical therapy including aqua therapy and massage therapy. Seiz also mentioned a possible TENS unit. Seiz changed Piper's NSAID and muscle relaxant medications. R. 829.

On January 5, 2016, Piper went to the emergency room at Memorial Medical Center in Springfield, Illinois, with complaints of back pain, thoracic pain and lumbar pain. R. 790-99. Piper said he had pain in his right lumbar radiating to the right leg. The pain was minimal at onset, but moderate now. The pain was worse with movement, bending over, standing, and walking. Piper said he had prior occasional episodes of back pain. R. 791. Piper said that this pain started three days earlier. He did not know of an injury that could have caused the pain. R. 793. A CT scan of the thoracic spine was normal. R. 793. X-rays and a CT scan of the lumbar spine degenerative disc disease most pronounced at L5-S1. The scan showed mild loss of intervertebral disc space at L5-S1. The impression was no acute abnormality and multilevel degenerative changes. R. 795-96, 822.

On January 7, 2016, Piper saw Dr. Salvacion for low back pain.  R. 787-89.  Piper reported he developed back pain in the previous week.  R. 787.  The pain was worse with movement, bending over, or prolonged walking.  The pain was relieved with rest and cool gel packs in the lumbar spine.  Piper said the fentanyl patch previously prescribed also helped with the pain.  R. 787.  On examination, Piper had a stiff, painful gait and pain when rising and sitting.  He had tenderness on palpation of his lumbosacral paraspinous muscles and pain on forward flexion of his spine.  He had limited range of motion in his lumbar spine.  His lower extremities had normal strength, muscle tone, and sensation.  Dr. Salvacion assessed lumbar degenerative disk disease and lumbar myalgia.  Dr. Salvacion prescribed aqua therapy.  Dr. Salvacion noted that a fentanyl patch prescription was refilled the day before.  Dr. Salvacion also refilled the muscle relaxant prescription, "The patient reports he has not been taking the tizanidine muscle relaxant recently since he was doing better with his cervical and shoulder pain with less incident of muscle spasming; however, with this recent lumbar muscle spasming I did agree to refill his prescription for him today."  R. 788.  Dr. Salvacion also prescribed an oral steroid anti-inflammatory and an analgesic cream.  R. 789.

On January 13, 2016, Piper saw Dr. Rahman. Piper said he had right lumbar back pain "for the past couple of months with occasional radiating pain" down his right leg above the knee.  Piper reported no numbness or tingling in his lower extremities.  He said that standing and walking long distances increased the pain and that prednisone provided some relief. Piper reported using a Fentanyl patch for the past four months with no relief.  He also reported left shoulder pain that interfered with his sleep. Piper rated his pain at 8/10.  He said the pain ranged from 6/10 to 10/10. On examination, Piper had normal gait, sensation, tone, reflexes, and range of motion.  His strength was 5/5 except for some weakness in right quadriceps with strength at 4/5.  He also had pain in his right quadriceps and hamstring.  Dr. Rahman recommended an injection into his right lumbar spine to relieve the pain.  R. 644.  On February 8, 2016, Dr. Rahman administered the injection.  R. 643.

On February 17, 2016, Piper saw Dr. Chris Wottowa, M.D. complaining of left shoulder pain.  Piper reported that Dr. El-Amin performed shoulder surgery on him twice.  He said that the two surgeries did not relieve his pain.  Piper said he also had neck surgery and elbow epicondylar surgery.  Piper reported that the neck surgery "helped out quite a bit."  He also said that the elbow surgery "did help with the pain."  R. 641-

3:18-cv-03249-SEM-TSH    # 21    Filed: 02/04/20    Page 15 of 29

42.  Piper reported that he currently had diffuse pain over his shoulders that radiated up towards his neck.  Piper had full range of motion in his right shoulder.  Piper's left shoulder had full range of motion with "a lot of guarding over his shoulder."  Piper also reported right-sided leg pain.  Piper reported that he had not worked since 2011 and "he is basically disabled because of all of his orthopedic problems."  R. 642.  X-rays were normal. Dr. Wottowa ordered more tests.  R. 642.

On October 13, 2016, Piper saw Dr. Rahman for a follow up.  Piper reported pain in his left hip for two months.  He also reported pain in the center of his back and in his left leg and hip.  Dr. Rahman diagnosed lumbar radiculopathy and recommended an injection in the left side of L5-S1.  He previously had an injection on the right L5-S1, and that injection gave significant pain relief.  R. 730.  On October 24, 2016, Dr. Rahman administered the injection.  R. 732.

On December 14, 2016, Piper saw Dr. Rahman for lumbar radiculopathy.  Piper reported that his pain improved on the left side after the injection, but his right side back pain worsened.  Piper rated his pain at 8/10.  He said that his pain ranged from 6/10 to 10/10.  On examination, Piper had normal sensation, tone reflexes and range of motion. He had a normal gait and 5/5 strength.  Straight leg testing was negative.  Dr.

Page **15** of **29**

Rahman ordered an MRI of Piper's lumbar spine.  R. 628.  The MRI

showed moderate to moderately severe spinal canal stenosis at L2-3 as

well as moderate size central focal disc herniation; severe neuroforaminal

stenosis on the left at L5-S1; and moderate spinal canal stenosis at several

other levels.  R. 618.

On January 23, 2017, Piper saw Dr. Rahman for a preoperative

examination for lumbar surgery scheduled for February 2017.  On

examination, Piper had joint pain and numbness.  R. 666.  On February 7,

2017, Dr. Rahman performed surgery on Piper's lumbar spine from L2-S1.

Dr. Rahman noted that after surgery, Piper's vital signs were stable and,

"Motor and sensory examination of bilateral upper and lower extremities

was grossly intact.  Dressing/drain intact." Piper was discharged the same

day.  R. 671-78.

<u>THE EVIDENTIARY HEARING</u>

On November 21, 2016, the Administrative Law Judge (ALJ)

conducted an evidentiary hearing.  R. 34-64.  Piper appeared pro se.

Vocational expert Dennis Gustafson also appeared.  R. 36.  The ALJ

explained to Piper that he had a right to be represented by an attorney at

the hearing.  The ALJ asked Piper if he would like to postpone the hearing

to get a representative or to proceed without representation.  Piper stated that he wanted to proceed without a representative.  R. 37.

The ALJ asked Piper if the medical records in the file were complete. Piper stated that the records omitted treatment after March 18, 2015.  The ALJ said that she would request the additional records.  R. 38-40.  After the hearing, the ALJ secured the records from March 18, 2015 through the February 2017 surgery discussed above.

Piper testified at the hearing.  He lived with his wife and a 21-year old daughter at the time of the hearing.  He had other adult children who did not live with him.  R. 42.

Piper testified that he took several medications for pain, including pain patches.  His medications did not help with the pain.  The pain patches did not really help and were not worth the risk.  R. 46.  Piper said the pain interfered with his sleep.  He indicated that he napped during the daytime. R. 47.  Piper reviewed his surgeries to date and the various injections he had for pain.  He testified that the more injections he has received, the less effective they were.  Piper did not use a brace on his left arm, and he did not use a cane to walk.  R. 49.

Piper testified that his primary care physician was treating him for depression.  He has not seen a specialist for depression.  R. 49.

Piper said that he had pain in his neck and shoulders that radiated down his arms. He had pain in his lower back that radiated into his buttocks and down into his leg. He also had numbness and tingling. The upper body pain was the worst and the pain was constant. Piper said the pain was worse if he walked "a lot" or if he tried to be more active. R. 50. Piper rated his pain at 6/10 or 7/10 and indicated heat or cold did not help. Cold made the pain worse sometimes. R. 51.

Piper testified that he could not raise his left arm over his head. He said that he could sit for half-an-hour and walk "a couple of miles or a mile." Prolonged sitting or walking made the pain worse. He could lift a gallon of milk in each hand and he could lift 20 pounds off the floor, "but I would probably pay for it." Piper continued, "I mean there's a lot that I could probably do, but I know how it's going to effect (sic) me. Like I try to help the wife at home, but if I do, it seems like it makes it worse." R. 52.

Piper said that he drove about three miles a week. For example, he drove to the gas station for a "freeze" or a drink. R. 43. Piper could not drive as well as he used to. He used a stove sometimes. R. 53. Piper said that he made sandwiches, mac and cheese, and cooked on the grill. R. 56. He used a computer to look for work and he could follow the plot of a television show if he liked the show. He got along with people. He saw

family and relatives on holidays.  R. 53-54.  Piper did not do laundry,

vacuum, sweep, or mop.  His wife paid the bills.  Piper occasionally went to

the grocery store.  When he went to the store, he usually left the store and

sat in the car while his wife shopped.  He sat in the car because of the pain.

Piper did not do yardwork.  R. 56-57.

Piper testified that he watched television at home.  He did not do

much more activity because he experienced more pain if he was more

active.  R. 58.  Piper occasionally went out to eat.  He could use utensils at

the table with his right hand.  He did not go to church or belong to other

organizations.  R. 57.

Piper was on light duty at work after his accident in August 2011 until

he stopped working in October 2011.  The company doctor put him on a

five pound lifting limit.  Piper said he could stand or sit when he was on light

duty.  R. 55.

Piper concluded his testimony:

I think more than anything, it's probably more the depression of
not being able to take care of my family, or do the things that I
used to do. I think that probably bothers me more than
anything.

And sometimes when I do fall asleep, I kind of hope that I won't
wake up because I know when I'm sleeping, I'm not feeling the
pain, what I'm going to feel when I wake up.

. . . .

> Because I have a hard time letting everybody do things for me
> when I'd always do it myself.

R. 59.  Piper denied ever going to the hospital and reporting that he felt

suicidal.  R. 59.

Vocational expert Gustafson then testified.  The ALJ asked Gustafson

the following hypothetical question:

> ALJ:  Okay.  I would like you to consider a hypothetical claimant
> of the same age, education and having the same past work as
> this claimant. Limited to range of light work with occasional
> climbing ramps and stairs.
>
> No climbing ladders, ropes or scaffolds.  Occasional balancing,
> stooping, kneeling, crouching and crawling.  Frequent reaching
> in front and laterally
> . . . .
> [w]ith the left non-dominant hand.  No overhead reaching
> bilaterally. Limited to frequent but not constant handling,
> fingering and feeling with the left hand.  And avoid even
> moderate exposure to cold, heat and hazards. Okay. Is there
> any past work he could do with these limitations?

R. 60-61.  Gustafson opined that such a person could not perform Piper's

past relevant work as a structural steel worker.  Gustafson testified that

such a person could perform the representative light jobs of production

inspection, with 3,200 such jobs in Illinois and 77,000 nationally; linen

grader, with 10,000 such jobs in Illinois and 60,000 nationally; assembler

production and hand packager, with 14,000 such jobs in Illinois and

204,000 nationally.  R. 61-62.

Page **20** of **29**

Gustafson also opined that such a person could also perform the representative sedentary jobs of order clerk food and beverage, with 600 such jobs in Illinois and 15,000 nationally; and telephone quotation clerk with 3,000 such jobs in Illinois and 72,000 such jobs nationally.  R. 62. Gustafson testified that a person could not work if he was off-task 20 percent of the time or if he was absent from work 2 days a month.  R. 63.

The ALJ then concluded the hearing.  The ALJ stated that she would secure the additional medical records for Piper's treatment after March of 2015.  R. 63.

### THE DECISION OF THE ALJ

On July 21, 2017, the ALJ issued her decision.  R. 18-28.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to

Page **21** of **29**

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ found that Piper met his burden at Steps 1 and 2.  Piper had

not worked since October 19, 2011 and Piper suffered from the severe

impairments of degenerative disc disease of the cervical and lumbar spines, headaches and history of traumatic injury to the left shoulder and arm.  R. 20.  The ALJ decided that Piper's depression was a non-severe impairment.  R. 22.  The ALJ decided at Step 3 that Piper's impairments or combination of impairments did not meet or equal a Listing.  R. 23.

> At Step 4, the ALJ found that Piper had the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except is limited to occasional climbing of ramps and stairs; may never climb ladders, ropes or scaffolds; limited to occasional balancing, stooping, kneeling, crouching and crawling; limited to frequent but not constant reaching in front, and laterally with the left, non-dominant hand and arm; no overhead reaching bilaterally; limited to frequent but not constant handling, fingering, and feeling with the left hand; must avoid even moderate exposure to cold, heat and hazards.

R. 23.  The ALJ relied on the fact that Piper and Dr. Rahman indicated that Piper's condition improved after the neck surgery in 2014 through the Date Last Insured, December 31, 2015.  The ALJ also cited several examinations after the 2014 surgery that showed normal strength, sensation, reflexes and range of motion.  R. 25-26.  The ALJ also relied on the examination by Dr. Chapa.  The ALJ noted that Dr. Chapa found 3/5 strength in the left arm and 3/5 grip strength in the left hand.  The ALJ noted that Dr. Chapa said the hand function was limited due to pain and

limited range of motion in the left shoulder.  The ALJ concluded that due to the effect of the shoulder on his left hand he would be limited to frequent use of his left hand and arm.  R. 26.

The ALJ said that he gave significant weight to the opinions of Drs. Gonzalez and Mack.  R. 26.  The ALJ stated, "Their opinion is supported by the medical and other evidence in the record as a whole."  R. 26.

The ALJ concluded at Step 4 that, given Piper's RFC, he could not return to his prior work as a steel worker.  At Step 5 the ALJ concluded that as of the Date Last Insured, December 31, 2015, Piper could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P Appendix 2, and the opinions of vocational expert Gustafson that a person with Piper's age, education, experience, and RFC, could perform the representative jobs of product inspection, linen grader, and assembly production and hand packaging.  The ALJ concluded that Piper was not disabled.  R. 28.

Piper appealed the decision of the ALJ.  On August 4, 2018, the Appeals Council denied Piper's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1. Piper died in August of 2018.  See Complaint (d/e 1) ¶ 6.  Lori Piper, his surviving spouse, filed this action for judicial review on behalf of Piper.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ failed to articulate minimally her analysis of all the relevant evidence.  In particular, the ALJ failed to articulate her analysis of the opinions of Drs. Gonzalez and Mack.  The ALJ gave the opinions "significant weight" and said the opinions were "supported by the medical and other evidence in the record as a whole."  R. 26.  Drs. Gonzalez and Mack, however, limited Piper's RFC to occasional pushing and pulling.  R. 69, 83-84.  The ALJ did not include any restrictions on pushing and pulling in the RFC and did not explain why she varied from their opinions.  Drs. Gonzalez and Mack also limited Piper's RFC to occasional reaching laterally and in front with both arms and occasional use of his left hand.  R. 70, 84-85.  The ALJ found Piper had no limitations on reaching in front and laterally with his right arm; she found that Piper could frequently, rather than occasionally, use his left hand and reach in front and laterally with his left arm. The difference between frequent and occasional use could be material.  Frequent means performing the task up to two-thirds of an eight-hour workday; occasional means performing the task up to one-third of an eight-hour workday.  See e.g., R. 83.  The ALJ needed to explain why she rejected material aspects of these medical opinions when she found that the opinions were entitled to significant weight and were supported by the

evidence in the record as a whole. The lack of any attempt to explain the inconsistency constitutes a failure to minimally articulate her analysis of this evidence.

In addition, the ALJ made no mention of pain specialist Dr. Salvacion's treatment of Piper. Dr. Salvacion's treatment notes were in Exhibit 12F before the ALJ. The ALJ only cited portions of Exhibit 12F that concerned Dr. Rahman's October 2016 injection into Piper's left lumbar spine, the January 2017 presurgical examination and February 7, 2017 lumbar spine surgery. R. 22, 26.[3] The ALJ skipped from Dr. Chapa's examination on March 18, 2015, to the October 2016 injection without ever mentioning Dr. Salvacion's treatment notes. R. 22, 26. Dr. Salvacion was a pain specialist. His office treated Piper several times for severe chronic pain between May and September 2015, as well as January 7, 2016, just after the Date Last Insured, December 31, 2015. Dr. Salvacion prescribed very powerful narcotic medications including Butrans and Fentanyl patches. The ALJ did not mention any of this evidence. The evidence from Dr. Salvacion's treatment notes seems to weigh against the evidence cited by

---

[3] The ALJ incorrectly stated at one point that the February 7, 2017 back surgery occurred in February 2016. R. 26. The ALJ elsewhere correctly noted the correct date for the surgery. R. 22; see R. 671-78.

the ALJ that Piper's condition improved after the 2014 neck surgery.  The ALJ should have explained how she weighed the evidence from Dr. Salvacion's treatment notes in reaching her findings.  At this point, the Court cannot tell whether the ALJ considered Dr. Salvacion's treatment of Piper at all in her decision.

In light of the ALJ's failures to articulate how she evaluated the opinions of Drs. Gonzalez and Mack, and her failure to mention the treatment by pain specialist Dr. Salvacion, the Court recommends that the matter should be reversed and remanded for further proceedings.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Lori Piper's Motion for Summary Judgment (d/e 13) should be ALLOWED, the Defendant Commissioner's Motion for Summary Affirmance (d/e 18) should be DENIED, and the decision of the Commissioner should be REVERSED and REMANDED for further proceedings pursuant to 42 U.S.C. § 405(g) sentence four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   February 4, 2020


____s/ _Tom Schanzle-Haskins_____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE